FILED
2019 Apr-11 PM 03:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **BRANDI HICKS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE** |
| | ) | **NUMBER: __________** |
| **LIBERTY LIFE ASSURANCE** | ) | |
| **COMPANY OF BOSTON,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

Comes now the Plaintiff, Brandi Hicks, and hereby files her Complaint against Liberty Life Assurance Company of Boston.

## PARTIES

1. The Plaintiff, Brandi Hicks ("Ms. Hicks"), is an insured under Long-Term Disability Policy No. 5955627.

2. Defendant, Liberty Life Assurance Company of Boston ("Liberty") is the Administrator for the Plan issued to Wal-Mart Stores, Inc. ("Wal-Mart"). Upon information and belief, Liberty is a foreign corporation doing business in the State of Alabama, specifically within this district.

## JURISDICTION AND VENUE

3. This action arises under the Employee Retirement Income Security

Act of 1974 ("ERISA"), 29 U.S.C. §1001, et seq. Plaintiff asserts claims for long-term disability benefits, enforcement of ERISA rights, and statutory violations of ERISA under 29 U.S.C. §1132. This Court has subject matter jurisdiction under ERISA without respect to the amount in controversy or the citizenship of the parties. 29 U.S.C. §1132(a),(e)(1) and (f) and 28 U.S.C. §1131. Venue is proper in this district pursuant to 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b).

## INTRODUCTION

4. The traditionally held purpose of the ERISA statute is "to promote the interest of employees and their beneficiaries in employee benefit plans." *Shaw v. Delta Airlines, Inc.*, 463 U.S. 85, 90 (1983). Ms. Hicks, as an employee insured for disability, was supposed to be treated as a beneficiary by the Defendant as statutory fiduciary. Instead, the Defendant has victimized Ms. Hicks by engaging in utterly reprehensible claim handling procedures. The shortcomings of ERISA as it relates to claims for "welfare" benefits have been exploited by the Defendant to avoid paying Ms. Hicks's valid claim that would otherwise be payable under state insurance law. As described in more detail below, the Defendant has clearly engaged in bad faith claim handling and Ms. Hicks, at a minimum, is patently entitled all relief that ERISA provides.

## STATEMENT OF FACTS

5. Ms. Hicks is an insured under Liberty's Group Policy No. 5955627

("the Plan") sponsored by her employer Wal-Mart Stores, Inc. The insurance provides insureds, like Ms. Hicks, long term disability benefits. (*See* LTD Policy, attached hereto as Exhibit "A").

6. Ms. Hicks was born on January 26,1977. She worked for Wal-Mart as a Pharmacist until her disabilities, primarily Lyme borreliosis complex (LBC), prevented her from returning to work on or around April 10, 2016.

7. Ms. Hicks's medical impairments include LBC, Rocky Mountain Spotted Fever, hypothyroidism, non-epileptic seizures, muscle weakness, cognitive dysfunction, severe, chronic pain. Ms. Hicks also suffers the side effects of her necessary medications. All of these conditions and their associated symptoms have left Ms. Hicks unable to work in any capacity.

8. Ms. Hicks' symptoms began after she suffered frequent Strep throat and flu-like diagnoses, which resulted in tonsillectomy surgery during March of 2016. (*See* St. Bernards Medical Center Pathology Report, dated March 11, 2016, attached hereto as Exhibit "B").

9. Unfortunately, Ms. Hicks suffered complications while recovering from tonsillectomy surgery. During a post-operative visit with Dr. Shane Smith, Ms. Hicks complained of dehydration and severe pain in her throat and ears. Concerned, Dr. Smith admitted Ms. Hicks to assess her dehydration and pain. (*See* St. Bernards Healthcare Discharge Summary, dated March 21, 2016, attached

hereto as Exhibit "C").

10. The next month, Ms. Hicks was forced to stop working due to severe headaches and nausea. In a consultation with her physician, Dr. Brandon Lane, Ms. Hicks indicated that she suffered a cat bite the Sunday before her appointment. Dr. Lane prescribed Ms. Hicks pain medications, but advised her to return if her symptoms return or worsen. (*See* St. Bernards Medical Center Progress Notes, dated April 13, 2016, attached hereto as Exhibit "D").

11. Unfortunately, Ms. Hicks' symptoms did not improve, and she returned and met with Dr. Robert Allen two days later on April 15, 2016. During this visit, Ms. Hicks complained of worsening headaches and nausea. Dr. Allen advised that she undergo bedrest if symptoms recur. (*See* St. Bernards Medical Center Progress Notes, dated April 15, 2016, attached hereto as Exhibit "E").

12. Two weeks later on April 28, 2016, Dr. Terry Kosinski ordered an MRI of Ms. Hicks' brain. The MRI physician, Dr. Cade Martin, discovered that Ms. Hicks had an "increased flair signal in the right frontal lobe" and that a "demyelinating process" could also be considered. (*See* St. Bernards Imaging Report, dated April 28, 2016, attached hereto as Exhibit "F").

13. The next month, Ms. Hicks visited Dr. Tona Alba and complained of significant weakness and numbness in her legs. Ms. Hicks also complained that it was difficult for her to get up from sitting or lying. Dr. Alba referred Ms. Hicks for

further testing to rule out the possibility of MS. (*See* Cleveland Clinic Progress Notes, dated May 23, 2016, attached hereto as Exhibit "G").

14. In June of 2016, Ms. Hicks began seeing a neurologist, Dr. Torin Gray. During this visit, Ms. Hicks complained of joint pain, swelling, brain fog, muscle weakness, and hand tremors. Ms. Hicks believed that her symptoms worsened after suffering a cat bite, and that she may have Lyme disease. Concerned, Dr. Gray ordered blood testing and referred Ms. Hicks to a Lyme disease specialist, Dr. Joseph Jemsek. (*See* Gray Family Clinic Notes, dated June 6, 2016, attached hereto as Exhibit "H").

15. After conducting various blood tests, Ms. Hicks tested positive for Rocky Mountain Spotted Fever, a tick-borne illness. (*See* Gray Family Clinic Lab Results, attached hereto as Exhibit "I").

16. Later in September of 2016, Ms. Hicks met with Dr. Jemsek and stated that she was frequently exposed to ticks from living near woods. Ms. Hicks also explained that in the past she has found ticks on both her and her pets. Dr. Jemsek ultimately confirmed Ms. Hick's diagnosis of Rocky Mountain Spotted Fever and Lyme borreliosis complex (LBC). (*See* Jemsek Specialty Clinic Initial Consultation, dated September 20, 2016, attached hereto as Exhibit "J").

17. During this visit, Ms. Hicks also complained of several seizures that occurred two weeks prior to her appointment, and stated that they occurred three to

eight times per day. In fact, Dr. Jemsek noted that Ms. Hicks even suffered a seizure that lasted three to four minutes during her appointment. (*See* Exhibit "J").

18. Dr. Jemsek ultimately opined that he was "highly suspicious that LBC is playing a role" in Ms. Hicks' neurological, gastrointestinal and endocrinological health, and stated that "[g]iven her exposure and progressive health decline . . . this is a pattern we see quite frequently in our patients, as the immune system is unable to remain in control." (*See* Exhibit "J").

19. After witnessing the severity of Ms. Hicks' LBC firsthand, Dr. Jemsek completed a certification form to explain Ms. Hicks' condition. Based on the severity of her ongoing symptoms, Dr. Jemsek opined that Ms. Hicks' condition "requires continuous leave at present time," and she is "unable to perform any and all essential job functions, including basic attendance." (*See* HCP Certification, dated September 22, 2016, attached hereto as Exhibit "K").

20. In addition to his certification, Dr. Jemsek wrote to Liberty on September 22, 2016 to further explain the severity of her debilitating illnesses. Dr. Jemsek explained that Ms. Hicks' condition is a chronic and long-term "multisystem inflammatory illness" that causes a multitude of symptoms, such as "profound and persistent fatigue," "cognitive dysfunction," "multi-faceted pain issues with joint, muscle, neurogenic, and bone pain," and frequent seizures. (*See* Physician's Letter to Liberty, dated September 22, 2016, attached hereto as Exhibit

"L").

21. Perhaps most importantly, however, Dr. Jemsek opined that Ms. Hicks' functionality remained "markedly impaired in multiple areas" and her conditions rendered "even sedentary activities such as typing or computer work laborious and difficult." (*See* Exhibit "L").

22. Unfortunately, Ms. Hicks' condition did not improve after LBC treatments. In a follow-up appointment with Dr. Jemsek in November of 2016, Ms. Hicks complained that, despite slight improvement in her seizure frequency, her other overall symptoms, such as her cognitive functioning, worsened. (*See* Jemsek Specialty Clinic Notes, dated November 30, 2016, attached hereto as Exhibit "M").

23. In complete disregard of the abundant evidence that Ms. Hicks was disabled, Liberty informed Ms. Hicks by letter dated December 20, 2016, that she did not meet the definition of disability and therefore no benefits were payable to her. (*See* Liberty Denial Letter, dated December 20, 2016, attached hereto as Exhibit "N").

24. Liberty primarily justified its denial of benefits based off the absurd assumption that, despite Dr. Jemsek's opinions that Ms. Hicks's neurological symptoms resulted from Ms. Hicks' LBC, many of Ms. Hicks' symptoms such as migraines were pre-existing, and ultimately forced and Ms. Hicks into the pre-existing limitation of her policy. (*See* Exhibit "N").

25. Liberty also justified their denial based off the opinions of a paid paper reviewer, Dr. John Brusch, who has never even met Ms. Hicks. The reviewer audaciously opined that, despite clear medical documentation of Ms. Hicks' LBC diagnosis, that "[t]there are no infectious disease diagnoses supported by the medical information on file," and that there were no findings on any of her examinations to support a clinical basis for those symptoms. (*See* Exhibit "N").

26. Liberty's denial was riddled with attempts to cherry-pick the record, and wholly ignored the continued statements from Ms. Hicks' treating physicians that showed she remained disabled. Liberty absurdly suggested that Ms. Hicks, a woman with Lyme disease accompanied by muscle weakness, chronic fatigue, chronic pain, and frequent seizures, can perform the material and substantial duties as a Wal-Mart Pharmacist. This assertion flies directly in the face of clear medical evidence.

27. After Liberty's wrongful termination of benefits, Ms. Hicks' condition did not improve as she continued to suffer a multitude of neurological symptoms that stemmed from her LBC. One month after her initial denial, Ms. Hicks visited with Ms. Marissa Hogan, APRN, and complained of another "acute" onset of seizures, as well as an increase in anxiety and depression. (*See* Pocahontas Medical Clinic Notes, dated January 12, 2017, attached hereto as Exhibit "O").

28. Later that month, Dr. Gray completed a certification form to explain Ms. Hicks' functional limitations. Dr. Gray stated that Ms. Wilson's conditions could last for years and will require continued treatment and recovery. Ultimately, Dr. Gray opined that that Ms. Hicks is unable to perform "all functions" of her occupation. (*See* HPC Certification Form, dated January 18, 2017, attached hereto as Exhibit "P").

29. Ms. Hicks also developed severe, chronic joint pain as a result of her LBC. In May of 2017, Ms. Hicks visited with Dr. Drew Dawson and complained of severe pain throughout her body. To combat this, Dr. Dawson prescribed joint injections. (*See* Pocahontas Medical Clinic Notes, dated May 19, 2017, attached hereto as Exhibit "Q").

30. Dr. Dawson also completed a Physical Functional Capacity Form to explain Ms. Hicks' limitations. Dr. Dawson stated that Ms. Hicks' conditions prevent her from standing and sitting for prolonged periods of time, and that she can reach above her shoulders, reach down to the floor, and carefully handle objects for only 1-33% of the time. (*See* Physical Functional Capacity Form, dated May 31, 2017, attached hereto as Exhibit "R").

31. Due to overwhelming medical evidence that her conditions did not improve, Ms. Hicks appealed her wrongful termination of benefits by letter dated June 16, 2017. Along with her appeal, Ms. Hicks included updated medical

records, declarations, and informational excerpts regarding the severity of Ms. Hicks' LBC and its many symptoms, many of which Liberty wrongfully determined were pre-existing conditions completely separate from and LBC. (*See* Plaintiff's Appeal Letter, dated June 16, 2017, attached hereto as Exhibit "S").

32. Despite abundant evidence that Ms. Hicks was disabled and her treating physicians consistently opined to that effect, Liberty denied Ms. Hicks' appeal by letter dated August 10, 2017. Once again, Liberty relied on the opinions of paid reviewers, who have never met Ms. Hicks, and forced Ms. Hicks into the pre-existing condition limitation of her policy. (*See* Final Denial Letter, dated August 10, 2017, attached hereto as Exhibit "T").

33. The paid reviewer, Dr. Imad Durra, absurdly determined that, despite abundant evidence to the contrary, Ms. Hicks' medical records failed to provide evidence of any infectious diagnosis, and that there is "no plausible explanation for her subjective symptoms and no objective evidence whatsoever for either her cognitive or physical complaints." (*See* Exhibit "T").

34. Liberty acknowledged the fact that Ms. Hicks' physicians opined that she could not work, but then decided to give no weight to those determinations at all. (*See* Exhibit "T").

35. Not only does Liberty's denial completely ignore the consistent opinions of Ms. Hicks' physicians that she remained disabled, but also completely

ignored evidence of Ms. Hicks' medical records that clearly explained that the majority of her symptoms were caused by LBC and were not separate, pre-existing conditions, but rather symptoms accompanied by her more recently developed LBC. This type of conduct is especially egregious considering that Ms. Hicks was supposed to be treated as a beneficiary under the Plan.

36. After Ms. Hicks' final denial, she applied and was approved for Social Security Disability benefits on August 27, 2017. The SSA determined that, based upon the reliable medical evidence presented, Ms. Hicks was disabled as of April 12, 2016. (*See* SSA Notice of Award, dated August 27, 2017, attached hereto as Exhibit "U").

37. Although Ms. Hicks' SSA award was after her final denial, Ms. Hicks wrote to Liberty and requested that her file be reopened to consider this evidence on June 1, 2018. As of this date, neither Ms. Hicks nor her counsel has received a response. (*See* Plaintiff's Request for Reconsideration, dated June 1, 2018, attached hereto as Exhibit "V").

38. As of this date, Ms. Hicks has been denied benefits rightfully owed to her under the plan. Liberty's decision to deny LTD benefits under the plan was grossly wrong, without basis, and contrary to the evidence.

39. Ms. Hicks met and continues to meet the Plan's definition of "disabled."

40. The Defendant did not establish and maintain a reasonable claim procedure or provide a full and fair review of Ms. Hicks's claim as required by ERISA. Instead, Defendant acted only in its own pecuniary interests and violated ERISA by conduct including, but not limited to, the following: breaching their fiduciary duty to Plaintiff, reviewing the claim in a manner calculated to reach the desired result of denying benefits; and failing to properly consider and credit the medical opinions of Ms. Hicks's medical providers; and failing to properly reconsider her file based on the decisions of the SSA.

41. Upon information and belief, the Plan does not grant discretionary authority to determine eligibility for benefits to Liberty or to any other entity who may have adjudicated Ms. Hicks's claim. Therefore, the Court should review the Plaintiff's claim for benefits under a *de novo* standard. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). In the alternative, the denial of Plaintiff's benefits constitutes an abuse of discretion.

42. Upon information and belief, Liberty was required to both evaluate and pay claims under the LTD Plant at issue, creating an inherent conflict of interest.

43. Ms. Hicks has exhausted any applicable administrative review procedures, and Liberty's refusal to pay benefits is erroneous, unreasonable, and has caused tremendous financial hardship on Plaintiff.

44. Ms. Hicks is a woman struggling to live, at best, a pain-free, normal lifestyle. Liberty's assertion that she is not disabled is at the very least unreasonable.

**DEFENDANT'S WRONGFUL AND UNREASONABLE CONDUCT**

**A. Defendant's Determination that Plaintiff does not Meet the Definition of Disability as Stated in the Plan was both Erroneous and Unreasonable.**

45. The Long Term Disability Plan at issue states, in part:

> "Disability" or "Disabled", with respect to Long Term Disability, means:
>
> 1. For persons other than truck drivers, pilots, co-pilots, and crewmembers of an aircraft:
>
> i. that during the Elimination Period and the next 12 months of disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation; and
>
> ii. thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation.

(*See* Exhibit "A")

46. Liberty failed to properly evaluate the effect Ms. Hicks's conditions as a whole would have on her ability to work. Ms. Hicks has never failed to meet the Plan's definition of disabled. Liberty unreasonably asserts that Ms. Hicks became ready to work on December 20, 2016, without any change or improvements in her diagnoses.

47. Liberty has also unreasonably failed to justify why in each of its denial letters it has reached a different determination than Dr. Jemsek and Dr. Dawson. Dr. Jemsek repeatedly stated that Ms. Hicks is disabled due to her seizures, cognitive dysfunction, and muscle weakness. Moreover, Dr. Jemsek consistently stated that all of her debilitating symptoms stemmed from LBC, and not a pre-existing condition. In addition, Dr. Dawson stated that Ms. Hicks is disabled due to severe, chronic pain that radiates throughout her entire body. Ms. Hicks has been continually prescribed strong treatments and medications for her seizures and pain.

**B. Defendant's Decision to Terminate Long Term Disability Benefits was not Supported by Substantial Evidence.**

48. The objective medical evidence in Ms. Hicks's file overwhelmingly shows that she is completely disabled from any occupation. In order to review the claim in a way that would reach the intended result of a denial of benefits, Liberty consistently cherry-picked the record and completely ignored relevant evidence of Ms. Hicks' disabilities.

49. Ms. Hicks's medical files clearly demonstrate that she is disabled. Ms. Hicks's physicians have attested to her disabilities on multiple occasions.

50. In weighing the opinions of Ms. Hicks's providers against those of the independent reviewers retained by Liberty, the Court should consider the following factors: (i) the frequency of examination and the length, nature, and extent of the

treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) other relevant factors. *See Karanda v. Connecticut Gen. Life Ins. Co., et al.,* 158 F. Supp. 2d 192, 205 and n.8 (D. Conn. 2000) (citing *Durr v. Metropolitan Life Ins. Co.,* 15 F. Supp. 2d 205, 213 (D. Conn. 1998)). The Court in *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 832, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003) recognized that "treating physicians, as a rule, have a greater opportunity than consultants to know and observe the patient as an individual."

51. While *Nord* provides that this Court is not required to adopt a per se rule to treat Ms. Hicks's physicians' opinions with more weight than those of Defendant's medical assessors, "[c]ommon sense and a stream of legal precedent suggest, however, factual determinations of a treating physician are objectively more reliable." *Burt v. Metropolitan Life Insurance Co.,* No. 1:04-CV-2376-BBM, 2005 U.S. Dist. LEXIS 22810, at *33 (N.D. Ga. Sept. 16, 2005); *see also Finazzi v. Paul Revere Life Ins. Co.*, 327 F.Supp.2d 790, 795-96 (W.D. Mich. 2004) ("the Court is not obliged to 'rubber stamp' [defendant's] termination of benefits . . .").

52. Paid experts are more often than not pre-disposed or preconditioned. Courts have consistently expressed their skepticism of such "experts" and held their reviews to be the very essence of arbitrariness and capriciousness. *Bennett v. Kemper HAT-Svcs, Inc.* 514 F. 3d 547, 554-55 (6th Cir. 2008); *Montour v. Liberty*

*Life and Acc. Ins. Co.,* 588 F. 3d 623 (9th Cir. 2009); *Regula v. Delta Family Care Plan* 226 F.3d. 1130, 1143 (9th Cir. 2001). The Supreme Court has acknowledged that "physicians repeatedly retained by benefits plans may have an 'incentive to make a finding of "not disabled" in order to save their employers money and preserve their own consulting agreements.'" *Nord,* 538 U.S. 822, 832, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003). The fact that their reports are consistently in conflict with the opinion of treating doctors' determinations should be viewed as evidence of a structurally conflicted process that results in bias.

53. Clearly, in Ms. Hicks's case, these decisions indicate that her own medical physicians' evaluations should be afforded far greater weight than those of the Defendant. Accordingly, Defendant's denial of Ms. Hicks's LTD benefits, based on insufficient evidence, was arbitrary and capricious.

**C. Defendant's Failure to Properly Credit Ms. Hicks's Well-Documented Complaints of Cognitive Dysfunction and Chronic Pain was Arbitrary and Capricious.**

54. Some of Ms. Hicks's primary disabling impairments have subjective components; however, they have been diagnosed by her treating physicians based on her medical history, physical examinations, and observation. In their denial letters, Liberty made no mention of how Ms. Hicks's frequent seizures and chronic pain would affect her ability to perform work, nor is there any evidence in the records that Liberty even considered Ms. Hicks's pain in deciding whether or not

to terminate her benefits.

55. In *Quigley v. UNUM Life Ins. Co. of America,* 340 F. Supp. 2d 215, 224 (D.Conn. 2004), the Court held "[w]here the record reveals well-documented complaints of chronic pain, and there is no evidence in the record to contradict the claimant's complaints, the claim administrator, and the court, cannot discredit the claimant's subjective complaints. *Id* at 224.

56. In *Creel v. Wachovia Corp*., No. 08-10961, 2009 U.S. App. LEXIS 1733, 2009 WL 179584 (11th Cir. Jan. 27, 2009) and *Oliver v. Coca-Cola Co*., 497 F.3d 1181, 1196-97 (11th Cir. 2007), vacated in part on other grounds, 506 F.3d 1316 (11th Cir. 2007), the United States Court of Appeals for the Eleventh Circuit considered when it was substantively reasonable to deny benefits for disabilities involving subjective elements. In *Creel*, the plaintiff applied for disability benefits based on a diagnosis of depression, anxiety, and migraine headaches. She received long-term disability benefits, but the benefits were terminated after twenty-four months pursuant to a mental disorder limitation. She sued the insurance company to recover additional benefits based on her migraine headaches. She provided chart notes, standard diagnoses, and lab reports from multiple physicians to support her claim, but the district court entered summary judgment against her because she did not provide objective evidence. The Court of Appeals vacated the summary judgment order, explaining:

> Our prior cases provide guidance for assessing the reasonableness of benefits denials for disabilities that involve some subjective element, such as migraines, fibromyalgia, and chronic pain syndrome. . . . When the plan has no [objective evidence requirement,] we evaluate the reasonableness of the decision in light of the sufficiency of the claimant's subjective evidence and the administrator's actions. Assuming that the claimant has put forward ample subjective evidence, we look at what efforts the administrator made to evaluate the veracity of her claim, particularly focusing on whether the administrator identified any objective evidence that would have proved the claim and on what kinds of independent physician evaluations it conducted. Accordingly, an administrator's decision to deny benefits would be unreasonable if it failed to identify what objective evidence the claimant could have or should have produced, even if the administrator submitted the file for peer review.

2009 U.S. App. LEXIS 1733, [WL] at *7

57. Applying this standard, the Court of Appeals in *Creel* found that the records offered by the plaintiff to corroborate her subjective complaints of disabling headaches were sufficient to support her claim and held that the administrator's decision was both wrong and unreasonable. 2009 U.S. App. LEXIS 1733, [WL] at *8. Similarly, in *Oliver*, the plaintiff sued his employer to recover long term disability benefits based upon radiculopathy and associated cervical pain, fibromyalgia, and chronic pain syndrome. The Court of Appeals held that it was arbitrary and capricious for an employer to deny benefits for disabilities involving elements of subjective pain when the claimant provided ample evidence and the administrator never requested any additional kind of evidence. *Oliver,* 497 F.3d at 1196-97.

58. Here, Ms. Hicks provided evidence to support the claims of her numerous medical impairments. Ms. Hicks's medical records contain well-documented complaints of seizures, cognitive dysfunction, muscle weakness, chronic pain, and treatments prescribed by her treating physicians. The records provided to Liberty show Ms. Hicks's struggles with LBC, as well as a host of other side effects from her necessary medications. Liberty did not credit these well-documented complaints of chronic pain or the opinions of Ms. Hicks's treating physicians, and instead unreasonably and erroneously terminated her claim.

**D. Liberty Failed to Properly Consider Ms. Hicks's Non-Exertional Limitations and Cognitive Requirements.**

59. In *Demirovic v. Bldg. Serv. 32 B-J Pension Fund,* 467 F.3d 208, 213-14 (2d Cir. 2006), the Court stated, "[A] reasonable interpretation of a claimant's entitlement to payments based on a claim of 'total disability' must consider the claimant's ability to pursue gainful employment in light of all the circumstances." Thus, an administrator must consider whether a beneficiary has "the vocational capacity to perform any type of work . . . that actually exists in the national economy." *Id.* at 213-215.

60. The Court must also consider non-exertional limitations including (1) intellectual and psychological limitations, including those related to the side effects of prescription medications and pain; (2) limited manual dexterity; and (3) a limited ability to remain seated for an extended period of time. Such non-exertional

limitations can be important aspects of vocational capacity. *See Rabuck v. Liberty Life and Accident Ins. Co.,* 522 F. Supp. 2d 844, 876-77 (W.D. Mich. 2007) (holding that failure to consider non-strength limitations of former company president with short-term memory limitations rendered Transferable Skills Analysis "incredible").

61. The duties of a Wal-Mart Pharmacist are very demanding, because they require traveling to and from multiple facilities, frequent reaching overhead, below the knees, bending, pulling, twisting, working in extreme temperatures, and working varying shifts, sometimes overnight. In addition to its many physical requirements, Ms. Hicks' job as a pharmacist requires utmost cognitive interaction, such as accurately processing prescriptions orders, ensuring compliance with company legal policies and procedures, and providing guidance to customers. Most importantly, however, her many duties must be fulfilled all while managing overall pharmacy operations. (*See* Job Description, attached hereto as Exhibit "W").

62. It is simply absurd to say that Ms. Hicks, a woman suffering from LBC and its many symptoms such as frequent seizures, cognitive dysfunction, migraines, muscle weakness, and chronic pain, can perform the material and substantial duties of her occupation. Even if Ms. Hicks were capable of her occupation's physical requirements, Ms. Hicks' cognitive impairments leave her with debilitating memory loss and brain fog that would most certainly render her

unable to perform the cognitive functioning that her occupation requires, notwithstanding the numerous seizures she may suffer throughout a given day. Moreover, Ms. Hicks takes a multitude of medications to combat her symptoms, including powerful pain killers, all of which carry various debilitating side effects.

### E. Liberty Failed to Justify Taking a Position Different from the Social Security Administration on the Question of Disability Upon Request for Reconsideration.

63. As previously noted, on June 1, 2018, Ms. Hicks' counsel requested that Liberty reopen her file and consider new evidence of her disability, including her favorable decision from the SSA. Neither Ms. Hicks nor her counsel have received a response from Liberty to date. (*See* Exhibit "V").

64. Because of this, Liberty failed to provide any substantive reasons for reaching a decision contrary to that of the SSA and any substantive reasons for deciding that Ms. Hicks was no longer qualified for long-term disability benefits.

65. The Social Security Administration's disability decision should be a "significant factor" in a Court's consideration of an administrator's decision to terminate plaintiff's disability benefits. *Glenn*, 461 F. 3d at 669. *See also Calvert v. Firstar Finance, Inc.*, 409 F. 3d 286, 294 (6th Cir. 2005). ("the Social Security Administration, though certainly not binding, is far from meaningless"). Even though a favorable decision in a Social Security disability appeal does not make a claim automatically entitled to disability benefits under an ERISA plan: [i]f the

plan administrator (1) encourages the applicant to apply for Social Security disability payments; (2) financially benefits from the applicant's receipt of Social Security; and then (3) fails to explain why it is taking a position different from the Social Security Administration on the question of disability, the reviewing court should weigh this in favor of a finding that the administrator's decision was arbitrary or capricious. *Bennett v. Kemper Nat. Services, Inc.*, 514 F. 3d 547, 554 (6th Cir. 2008). *See also DeLisle v. Sun Life Assur. Co. of Canada*, 558 F. 3d 440, 446 (6th Cir. 2009).

66. The Sixth Circuit has held that it is "totally inconsistent" to require a claimant to apply for Social Security disability benefits, avail itself of the Social Security Administration's determination and, at the same time, contend that the claimant is not disabled. *Darland v. Fortis Benefits Ins. Co.*, 317 F. 3d 516, (6th Cir. 2003) (partially overruled on other grounds by *Black and Decker Disability Plan v. Nord*, 538 U.S. 822, 834, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003)).

67. Although an ERISA plan administrator is not bound by a Social Security Administration determination finding of total disability, it is inappropriate for a plan administrator to discount a Social Security Administration award in making benefit determinations, especially when the claimant was required to apply for Social Security Administration benefits. *Bennett v. Kemper Nat'l Servs., Inc.*, 514 F. 3d 547, 553 (6th Cir. 2008). Indeed, "a decision by a plan administrator to

seek and embrace a Social Security Administration determination for its own benefits, and then ignore or discount it later, casts additional doubt on the adequacy of their evaluation of . . . [a] claim[.]" *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286-96 (6th Cir. 2005).

68. The Eleventh Circuit examined the juxtaposition between a Defendant insurer's self-interested SSD benefit policy requirements and its failure to give a Social Security Administration decision appropriate weight in its own disability denial determination under that same policy. *Melech v. Life Insurance Co. of N.A.*, 739 F.3d 663 (11th Cir. 2014). On appeal, the *Melech* Court described Defendant LINA's policy in that case as follows:

> To summarize, the Policy effectively requires all claimants to apply for SSDI [Social Security Disability Income] at the outset; if a claimant fails to do so, LINA can reduce her benefits under the Policy, if any, by the amount of SSDI LINA says she could have gotten. In the event that LINA decides to pay a claim, the Policy allows LINA to hold the claim open, at least with respect to the total amount LINA must pay, until the SSA reaches a final decision. LINA may assist the claimant in obtaining SSDI, even going so far as to transfer the medical evidence that LINA gathered to LINA's vendor, who then presumably transfers it to the SSA. And if the SSA denies the claimant's application, LINA can force the claimant to exhaust her administrative appeals. All this effort makes perfect sense from LINA's perspective because—having decided to pay the claim—every dollar the claimant gets from the SSA is one less dollar LINA has to pay.

*Melech*, 739 F.3d at 668. Given these policy provisions and the fact that LINA, at the time of its denial, did not have the evidence plaintiff presented to the SSA, the Court held "***that LINA had an obligation to consider the evidence presented to***

***the SSA.*** ” *Id*. at 666 (emphasis added). The Court went on to state that "in light of these openly self-interested efforts, ***we are troubled by the implication of LINA's actions in Melech's case, where it ignored her SSDI application and the evidence generated by the SSA's investigation once it no longer had a financial stake in the outcome.*** ” *Id*. at 674 (emphasis added).

69. In Ms. Hicks' case, the Plan required her to apply for Social Security Disability benefits and exhaust the highest level of Social Security Administration appellate review in the event such SSD benefits were initially denied. Ms. Hicks applied for Social Security Disability benefits, as required by the policy. Liberty was given a copy of the Social Security Notice of Award upon request for reconsideration but failed to respond. Ms. Hicks was found to be unable to perform or tolerate work at any level by the Social Security Administration.

## CAUSES OF ACTION

### Count One

### ERISA (Claim for Benefits Owed under Plan

70. Plaintiff hereby incorporates by reference each and every fact as if it was restated herein.

71. At all times relevant to this action, Ms. Hicks was a participant of the Long-Term Disability Policy No. 5955627 ("the Plan") within the meaning of 29 U.S.C § 1002(7), and was eligible to receive disability benefits under the Plan.

72. As more fully described above, the termination and refusal to pay Ms. Hicks benefits under the Plan for Long-Term Disability for the period of at least on or about December 20, 2016 through the present constitutes a breach of Defendant's obligations under the plan and ERISA. The decision to terminate benefits to Ms. Hicks was grossly wrong, unreasonable, and not based on substantial evidence.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays the Court to enter judgment for Plaintiff and otherwise enter an Order providing that:

1. The applicable standard of review in this case is *de novo*.

2. That the Court may take and review the records of Defendant and any other evidence that it deems necessary to conduct an adequate *de novo* review;

3. That Ms. Hicks met the Plan's definition of disabled;

4. Defendant shall pay Ms. Hicks all properly owed past due benefits in accordance with the policy;

5. Defendant shall pay to Plaintiff such prejudgment interest as allowed by law;

6. Defendant shall pay Plaintiff's costs of litigation and any and all other reasonable costs and damages permitted by law;

7. Defendant shall pay attorney's fees for Plaintiff's counsel;

8. Plaintiff shall receive such further relief against Defendant as the Court deems lawful, just and proper.

9. In the alternative, Plaintiff prays the Court to enter an Order remanding this case to Defendant, as administrator, to reconsider Plaintiff's appeal, taking into full consideration the evidence presented to the Social Security Administration and the Social Security Administration's decision.

Respectfully Submitted,

*/s/ Peter H. Burke*________________
Peter H. Burke (ASB-1992-K74P)
PBurke@burkeharvey.com
BURKE HARVEY, LLC
3535 Grandview Parkway
Suite 100
Birmingham, Alabama 35243
Phone: 205-930-9091
Fax: 205-930-9054

*Attorney for Plaintiff Brandi Hicks*

**PLEASE SERVE DEFENDANT BY CERTIFIED MAIL AT**:

Liberty Life Assurance Company of Boston
c/o Legal Department
175 Berkeley Street
Boston, MA 02116