FILED
2019 Apr-11 PM 03:07
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT

# "T"

Liberty Mutual
INSURANCE

Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213
Phone No.: (888) 437-7611
Secure Fax No.: (603) 334-5709

August 10, 2017

Jessica Hayslip
Burke Harvey
3535 GRANDVIEW PARKWAY
SUITE 100
BIRMINGHAM, AL 35243

RE: Long Term Disability (LTD) Benefits
Wal-Mart Stores, Inc.
Claim #: 5955627
Claimant: Brandi Hicks

Dear Jessica Hayslip:

We reviewed your appeal request for Long Term Disability ("LTD") benefits and maintained the decision to deny Brandi Hicks' benefits.

**Initial Claim Decision**

Ms. Hicks submitted an LTD claim for her absence from work as of April 12, 2016, due to reports of fevers, migraines and mild cognitive impairment attributed to a tick-borne illness. Her LTD benefits were due to begin on October 24, 2016 after the Policy's elimination period was completed. However, her claim was denied as the evaluation concluded that she was not disabled throughout and beyond the Policy's elimination period.

The evaluation also concluded disability caused or contributed to by the following conditions were excluded from LTD coverage due to the pre-existing condition exclusion: dermatitis, migraines (which she characterized as moderate in severity and associated symptoms include altered consciousness, confusion, right hemiplegia, nausea, photophobia, photophobia and seizure), post-menopausal syndrome, vitamin B12 deficiency, chronic back pain, attention deficit disorder, depression and insomnia.

The basis for the decision to deny benefits was outlined in a letter dated December 20, 2016. Ms. Hicks was provided an opportunity to request an appeal review of the denial, stating the reasons why she felt that her claim should not have been denied and to submit any additional information which she felt would support her claim.

**Appeal**

In your letter of appeal dated June 16, 2017, you indicated that Ms. Hicks has been disabled from two tick-borne infectious diseases, Lyme disease and Rocky Mountain spotted fever.

In support of Ms. Hicks' claim, you submitted a May 12, 2016 letter from Joseph Jemsek MD (internal medicine/infectious disease), January 18, 2017 certification of healthcare provider FMLA form from Dr. Gray (internal medicine), May 31, 2017 Physical Functional Capacity form from Dr. Dawson, June 2, 2017 statements from Mr. and Ms. Hicks and Deborah Kay Graves (claimant's mother), medical records, pharmacy records, Walmart Staff Pharmacist job description, California Lyme Disease Association Lyme Disease Symptom Checklist, and a 2008 article titled "Advanced Topics in Lyme Disease...".

**Appeal Evaluation**

Ms. Hicks' effective date of LTD coverage was June 15, 2015 and her reported disability began on April 12, 2016. Since her reported disability began within the first 365 days immediately after her effective date of coverage, her claim is subject to the pre-existing condition investigation for the period of June 15, 2014 to June 14, 2015. This means if, during that period, she was diagnosed or received treatment, including undergoing diagnostic measures, being prescribed drugs and /or medicines, or receiving care or services by a physician, for the same condition or a condition which caused or contributed to the condition of her reported disability, then her reported disability is excluded from LTD benefit coverage.

During the pre-existing time period in question, June 15, 2014 to June 14, 2015, the records show Ms. Hicks had a July 23, 2014 office visit with V. Bonette NP and it lists her current problems including migraine without aura, vitamin B12 deficiency, chronic low back pain, ovarian cyst, attention deficit disorder without hyperactivity, insomnia, post-menopausal HRT, hormone imbalance and moderate depression. It was noted in that record that Ms. Hicks characterized her migraines as moderate in severity, associated with altered consciousness, confusion, right hemiplegia, nausea, phonophobia, photophobia and seizure. She reported that she had migraines a few times a month. On April 29, 2015, Ms. Hicks had another appointment with V. Bonette NP for diagnoses including nausea and vomiting. In your appeal of Ms. Hicks' claim, you did not disagree with the pre-existing condition investigation conclusions. Our review of the file and additional information received on appeal does not offer any findings to alter the prior conclusion that the above listed conditions are pre-existing and excluded from coverage as defined by the Policy.

Ms. Hicks ceased work on April 12, 2016. She was seen in the emergency room on April 13, 2016 with reports of severe headache and nausea; reporting she was bitten by a cat on Sunday. Discharge impressions were headache, nausea and vomiting. On May 7, 2016, Ms. Hicks was also seen in the emergency room for headaches and nausea. These are conditions for which she was diagnosed or treated for in the pre-existing condition exclusion investigation period and they are excluded from LTD coverage.

Ms. Hicks reported that she went to Cleveland Clinic in May due to her myriad of symptoms; saw and endocrinologist and a neurologist; all tests were normal; and no follow-up appointment was scheduled.

Joseph Jemsek MD (internal medicine/ infectious disease) wrote a letter dated May 12, 2016, indicating that Ms. Hicks dates the onset of her substantial health issues to approximately January of 2016, although she had likely been ill for several years before the dramatic decline. He diagnosed her with Borreilosis Complex with neuroborreliosis. He concluded that due to the severity of her ongoing health issues, she is unable to maintain any gainful employment; "her impairment has lasted several years already", and may be anticipated to last at least 12-18 additional months.

On June 10, 2016, Ms. Hicks reported to Daniel Kalb MD (family medicine) that in 2013, she had a stroke-like event, where she came home from work, could not talk or move her right side, she was admitted to the hospital but all of her labs and CT were normal. Dr. Kalb's assessment from the June appointment was: other fatigue, dorsalgia (disorder characterized by discomfort/pain in back) unspecified, pain in unspecified joint and mild cognitive impairment-so stated. Dr. Kalb's assessment at the July 22, 2016 appointment was nonfamilial hypogammaglobulinemia, gammaherpes viral mononucleosis with other complications, other fatigue and mild cognitive impairment-so stated.

On September 13, 2016, Sheva Chervinskiy DO (assistant professor or internal medicine and pediatrics in division of pediatric allergy and immunology) indicated that overall, Ms. Hicks' entire immune work-up to date was normal.

At the September 20, 2016, visit with Dr. Jemsek, Ms. Hicks reported a prior episode in August 2013 of right-sided weakness that lasted three to four days but feeling poor for following two to three weeks. She reported "onset of seizure equivalent as of two weeks ago"; while she "always had cerebellar dysfunction, this is worse". On September 22, 2016, Dr. Jemsek wrote a letter indicating that she was under treatment for Lyme Borreilosis Complex focused on managing her key symptoms such as pain, dyssomnia and seizure episodes. Ms. Hicks' pre-existing conditions included pain, insomnia and migraines she characterized her symptoms including seizures.

On January 18, 2017, Dr. I. Torin Gray MD (internal medicine) completed an FMLA leave form indicating that she sought leave due to convulsive activity, fatigue, cognitive slowing, and joint pain.

On March 13, 2017, Ms. Hicks' followed-up with J. Drew Dawson MD (family practice) and reported that she was seen at Baptist Hospital and informed that her seizures were non-epileptic and that the second lesion on her brain was no longer there. Part of the treatment plan included that she be tapered off of the seizure medication because the diagnosis was pseudoseizure. The record also noted that Ms. Hicks was planning on going on a cruise. On May 31, 2017, Dr. Dawson completed a Physical Functional Capacity form indicating that he did not think that she could resume work at her previous employment because seizure-like activity frequently causes her speech and postural disability. Again, we note that in the pre-existing condition investigation period, Ms. Hicks treated for migraines which she characterized as associated with altered consciousness, confusion, right hemiplegia and seizure.

We note that Ms. Hicks' reports about a tick bite have varied. At her emergency room visit on April 13, 2016, she reported problems for past several months; she did not report any tick bites, but instead reported a cat bite. There is no mention of tick bite in the medical records until June 2016. At her appointment on June 10, 2016, she reported "no known tick bite prior but lives in the wood with pets". In another part of the record it notes she "has had a lot of tick bites". At her appointment on September 9, 2016, she reported that "these things started back in March of this year

with a cat bite. . . She had a tick bite around the time of her tonsils being taken out." (Tonsillectomy on March 11, 2016.) At her appointment on September 20, 2016, she reported that "the only tick attachment she can truly recall was after her illness began in 3/2016. She did not achieve an erythema migrains, however."

On December 13, 2016, Ms. Hicks' claim was reviewed by John Brusch MD, an independent physician who is board certified in internal medicine with a sub-specialty in infectious disease and added expertise in Lyme disease. Based on his review of the medical records, Dr. Brusch concluded that he believed she could work eight hours a day, five days a week without restrictions or limitations from an infectious disease perspective. There were no infectious disease diagnoses supported by the medical information in the file. He noted that while she has a multitude of symptoms, there are no findings on neurological examination or physical examination to support a physical basis for her symptoms. He noted that a diagnosis Lyme disease is based on documenting infection with Lyme organism - this is usually done by a positive IgG Western blot against Lyme or documentation of erythema migrans, the pathognomonic rash of early Lyme infection. Second, there must be documentation of organ dysfunction that is consistent with Lyme infection. He explained that neurological Lyme disease is manifested by cranial nerve dysfunction, peripheral neuropathy, documented cognitive dysfunction and neuropsychiatric testing. Musculoskeletal Lyme disease manifests itself as hot swollen septic-type of (arthritis). Dr. Brusch noted that Ms. Hicks has had many examinations physically without detection of such organ malfunction. In addition, she has no evidence of a positive Lyme serology, she has had no truly positive serologies for active infection including Lyme disease, Rocky Mountain spotted fever or EBV. Nor is there evidence of various types of hepatitis. Finally, while she has had complaints of cognitive impairment, there has been no objective support for it in her multiple neurological examinations or by any formal neuropsychological testing.

During the review of the appeal, Ms. Hicks' claim was reviewed by Imad Durra MD, an independent physician who is board certified in infectious diseases. Based on his review of the medical records, Dr. Durra concluded that he could not find any infectious or internal medicine related diagnoses supported by the medical evidence or any diagnosis that is causing functional impairment. He also concluded that any side-effects that Ms. Hicks was experiencing from her many medications and supplements, would not have been serious enough to be impairing. The overall functional and medical evidence supported that she had full-time employment capacity during the periods under review from April 12, 2016 to October 23, 2016 and from October 24, 2016 forward. This is because there is no plausible medical explanation for her subjective symptoms and no objective evidence whatsoever for either her cognitive or physical complaints. Dr. Durra disagrees with the treating provider's assessment because they have not documented any plausible medical condition that would require any restriction; she does not have any infection; she does not have any seizure disorder; and nothing has been shown objectively.

**Conclusion**

We conducted a thorough and independent review of Ms. Hicks' entire claim. Having carefully considered her LTD insurance coverage and the medical documentation contained in her claim, our position remains that the conditions that caused her to cease work on April 12, 2016 were *pre*-existing as defined by the Policy and excluded from coverage.

We also acknowledge that Ms. Hicks continued to report impairments and symptoms beyond April

12, 2016 and even beyond October 24, 2016. However, the information does not contain physical or cognitive exam findings, diagnostic test results or other forms of medical documentation supporting that she had impairments and symptoms due to non-pre-existing conditions. Or that those impairments and symptoms remained of such severity, frequency and duration that they resulted in restrictions or limitations rendering her unable to perform the duties of her own occupation, April 12, 2016 to October 24, 2016, throughout and beyond the Policy's elimination period.

Having carefully considered all of the information submitted in support of Ms. Hicks' claim, our position remains her conditions are pre-existing and excluded from coverage and that proof of her continued disability in accordance with the Policy provisions has not been provided. Therefore, no benefits are payable.

This claim decision reflects an evaluation of the claim facts and Policy provisions.

**Policy Provisions**

In order to receive benefits, you must satisfy the requirements of all Policy provisions that state, in part:

***Disability Benefit***
*When Liberty receives Proof that a Covered Person is Disabled due to Injury or Sickness and requires the Regular Attendance of a Physician, Liberty will pay the Covered Person a Monthly Benefit after the end of the Elimination Period, subject to any other provisions of this policy. The benefit will be paid for the period of Disability if the Covered Person gives to Liberty Proof of continued:*
*1. Disability;*
*2. Regular Attendance of a Physician; and*
*3. Appropriate Available Treatment.*
*The Proof must be given upon Liberty's request and at the Covered Person's expense. In determining whether the Covered Person is Disabled, for persons other than pilots and co-pilots, Liberty will not consider employment factors including, but not limited to, interpersonal conflict in the workplace, recession, job obsolescence, paycuts, job sharing and loss of a professional or occupational license or certification.*

*"**Disability**" or "**Disabled**", with respect to Long Term Disability, means:*
*1. For persons other than truck drivers, pilots, co-pilots, and crewmembers of an aircraft:*
*i. that during the Elimination Period and the next 12 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation;*

*"**Elimination Period**", with respect to Long Term Disability, means a period of consecutive days of Disability or Partial Disability for which no benefit is payable. The Elimination Period is shown in the Schedule of Benefits and begins on the first day of Disability.*

*"**Material and Substantial Duties**", with respect to Long Term Disability, means responsibilities that are normally required to perform the Covered Person's Own Occupation, or any other occupation, and cannot be reasonably eliminated or modified.*

*"**Own Occupation**", with respect to Long Term Disability, means the Covered Person's occupation that he was performing when his Disability or Partial Disability began. For the purposes of determining Disability under this policy, Liberty will consider the Covered Person's occupation as it is performed at Wal-Mart Stores, Inc .*

*"**Proof**" means the evidence in support of a claim for benefits and includes, but is not limited to, the following:*
*1. a claim form completed and signed (or otherwise formally submitted) by the Covered Person claiming benefits;*
*2. an attending Physician's statement completed and signed (or otherwise formally submitted) by the Covered Person's attending Physician; and*
*3. the provision by the attending Physician of standard diagnosis, chart notes, lab findings, test results, x-rays and/or other forms of objective medical evidence in support of a claim for benefits.*
*Proof must be submitted in a form or format satisfactory to Liberty.*

*"**Treatment**" means consulting, receiving care or services provided by or under the direction of a Physician including diagnostic measures, being prescribed drugs and/or medicines, whether the Covered Person chooses to take them or not, and taking drugs and/or medicines.*

***Pre-Existing Condition Exclusion***
*This policy will not cover any Disability or Partial Disability:*
*1. which is caused or contributed to by, or results from, a Pre-Existing Condition; and*
*2. which begins in the first 365 days immediately after the Covered Person's effective date of coverage.*

*"**Pre-Existing Condition**" means a condition resulting from an Injury or Sickness for which the Covered Person is diagnosed or received Treatment within 365 days prior to the Covered Person's effective date of coverage.*

Under the Employee Retirement Income Security Act (ERISA) appeal guidelines, you were entitled to appeal the decision made by Liberty Life Assurance Company of Boston (Liberty), and to submit any additional information you wished to be considered as part of the appeal. Liberty has conducted a full and fair review of your appeal and accompanying materials, and has concluded that the denial of benefits will be maintained.

At this time, your administrative right to review has been exhausted; no further review will be conducted by Liberty and your claim will remain closed. You may request to receive, free of charge, copies of all documents relevant to your claim. You have the right to bring a civil action under section 502(a) of ERISA following an adverse benefit determination on review.

Nothing in this letter should be construed as a waiver of any Liberty Life Assurance Company of Boston rights and defenses under the above captioned Policy, and all of these rights and defenses are reserved to the Company, whether or not they are specifically mentioned herein.

Decisions made by Liberty Life Assurance Company of Boston are based on the provisions outlined in Wal-Mart Stores, Inc. Group Disability Income Policy. These provisions are not contingent on decisions made by either the Social Security Administration or other disability-determining entities.

If you have any questions regarding this matter, please contact me.

Sincerely,

Stephanie Berry
Appeal Review Consultant
Phone No.: (888) 437-7611 Ext. 16391
Secure Fax No.: (603) 334-5709